NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0180n.06

Case No. 21-5646

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Apr 28, 2022
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| WENDELL HARRIS, as Administrator of the Estate of LaFerre Washington Harris, Deceased and on behalf of LaFerre Washington Harris, | ) ) ) |
| *Plaintiff-Appellee*, | ) ) |
| v. | ) ) |
| MIDTOWN CENTER FOR HEALTH AND REHABILITATION, LLC, dba Midtown Center for Health and Rehabilitation, | ) ) ) ) |
| *Defendant-Appellant*. | ) ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

O P I N I O N

Before: COLE, BUSH, and NALBANDIAN, Circuit Judges

NALBANDIAN, Circuit Judge. LaFerre Harris spent the last year of his life in Midtown Center for Health and Rehabilitation's nursing home. After his death, his estate sued Midtown alleging negligent care. Midtown believes this dispute should be handled out of court. It points to an arbitration agreement, signed as part of Harris's admission into the home, and argues that Harris agreed to arbitrate any disputes that arose between them and so his estate is bound by that agreement. The problem? Harris wasn't the one who signed the agreement. Instead, his wife, Mavis, signed it on his behalf, claiming to be his representative. Midtown says that Mavis was acting as Harris's agent, so her signature still binds the estate to the agreement. Yet Midtown's only evidence that Mavis was Harris's agent is Mavis's own representation in the agreement to

that effect. But in Tennessee, the statements of the agent, without more, can't prove agency. So we **AFFIRM**.

## I.

In October 2017, Mavis Harris took her husband, LaFerre Harris, to a nursing home owned by Signature HealthCARE (SHC). As part of his admissions paperwork, SHC required Harris to sign an agreement to informally resolve disputes. The agreement provided that neither party "will file a lawsuit against the other" and that the parties would arbitrate any disputes between them. (R. 63-2, PageID 455.) It also specified how the arbitration process would work, such as where the arbitration would take place, how an arbitrator would be chosen, and so on. The agreement further provided that it will bind "any person or entity that is later appointed to act on" the parties' behalf, including their "estates" and "successors." (*Id.* at PageID 456.)

But Harris didn't sign this agreement. Instead, Mavis signed it on his behalf, claiming to be the "[r]esident's [a]uthorized [r]epresentative." (*Id.* at PageID 457.) Mavis also placed her initials next to two relevant provisions: (1) "[t]he [r]esident, while able, gave me oral authority to make decisions for him/her," and (2) "I have handled the [r]esident's legal and business affairs for 5 (years/months)." (*Id.*)

In January 2018, SHC sold the nursing home to Midtown Center, which was owned by MC Consulting, LLC. After the sale, Harris remained at the home. But towards the end of 2018, he started having medical problems. These problems landed him at a local hospital, and he passed away shortly after.

After his death, Harris's estate sued Midtown and MC Consulting in state court. It alleged that because of Midtown's negligent care, Harris suffered from "[p]ressure ulcers," "[p]oor hygiene" and "[s]evere protein calorie malnutrition." (R. 1-2, Compl., PageID 11.)

Midtown removed the case to federal court and moved to compel arbitration. The district court denied the motion to compel but granted discovery on the question.[1]

After discovery, Midtown renewed its motion arguing, among other things, that Harris's estate is bound by the arbitration agreement because Mavis had express oral authority to sign the agreement on Harris's behalf. As evidence, Midtown pointed to Mavis's initials in the contract where she represented that she had Harris's oral authority to sign the agreement and that she handled his business for some time.

In response, the estate argued that it was not bound by the arbitration agreement because Mavis lacked any authority to sign the agreement for her husband and her statements alone couldn't prove otherwise.

The district court agreed with the estate. The court noted that "the sole evidence" of Mavis's authority was her representation in the contract. (R. 127, Order, 888.) Looking to

---

[1] Although Midtown asked to depose Mavis, the estate's attorney explained that she was too weak to sit for a deposition and offered to have other family members deposed instead. In the proceedings below, Midtown argued that because the estate refused to make Mavis available for a deposition, it shouldn't be allowed to disavow her contractual representation.

On appeal, Midtown again claims that the estate refused to make Mavis available. But this time, Midtown doesn't develop any legal arguments on the issue as it did below. So any argument about the deposition of Mavis's testimony is forfeited. *See Bard v. Brown County*, 970 F.3d 738, 750 (6th Cir. 2020) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited." (quoting *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013))).

In any event, we don't think Midtown took the necessary steps to take Mavis's deposition during discovery. Midtown didn't issue a subpoena to Mavis, who is a nonparty in the case. *See* Fed. R. Civ. Pro. 45. Nor did it request Mavis's written deposition. *See* Fed. R. Civ. Pro. 31. Finally, Midtown admitted that discovery on the arbitration issue was finished and that the question was ready to be decided.

As we have said before, the federal rules provide district courts with the tools to address any misconduct during discovery; it is "up to the parties, however, to invoke those remedies." *Nitch v. E. Gateway Cmty. Coll.*, 857 F. App'x 222, 223 n.1 (6th Cir. 2021). Midtown failed to invoke those remedies here.

Tennessee law, the court explained that the statements of an agent alone can't establish his agency. So the court held that Mavis lacked authority to sign the agreement on Harris's behalf and, therefore, Harris's estate wasn't bound by it. The district court denied the motion to compel and Midtown appealed.

## II.

"We review a district court's denial of a motion to compel arbitration de novo." *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 716 (6th Cir. 2012) (quoting *Hurley v. Deutsche Bank Tr. Co. Ams.*, 610 F.3d 334, 338 (6th Cir. 2010)) (italics omitted).

Under the Federal Arbitration Act (FAA), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA permits a district court to compel arbitration but only if it finds that a valid arbitration agreement exists. *See id.* § 4; *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). After all, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quotation omitted).

And because arbitration agreements are contracts, we look to state law to determine their validity. *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1995)). Here, the arbitration agreement provides that Tennessee law governs. The parties don't dispute this, so we apply Tennessee's law. *See AtriCure, Inc. v. Meng*, 12 F.4th 516, 525 (6th Cir. 2021) (explaining that when parties agree on governing law, courts do not resolve choice-of-law questions). In Tennessee, arbitration agreements may be "voided for the same reasons for which any contract may be invalidated under

Tennessee law." *Sevier Cnty. Schs. Fed. Credit Union v. Branch Banking & Tr. Co.*, 990 F.3d 470, 475 (6th Cir. 2021) (brackets omitted).

### III.

The only issue on appeal is whether Mavis's signature binds Harris's estate to the arbitration agreement. That question turns on whether Mavis had authority to sign the agreement on behalf of Harris. To answer this, we turn to Tennessee's agency law.

In Tennessee, an agent may bind a principal to a contract if he acts within the "scope of his actual and apparent authority."[2] *Bells Banking Co. v. Jackson Ctr., Inc.*, 938 S.W.2d 421, 424 (Tenn. Ct. App. 1996); *see also Johnson v. LeBonheur Child.'s Med. Ctr.*, 74 S.W.3d 338, 343 (Tenn. 2002). The burden of proving agency is on the "party asserting the agency relationship." *See Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009). So for Mavis's signature to bind Harris to the arbitration agreement, Midtown must prove that Mavis had Harris's authority to sign it.

But Midtown fails to meet this burden. As Midtown itself recognizes, the only evidence it has to offer is Mavis's own representation in the contract. Midtown points to Mavis's initials next to two statements in the agreement where she represented that she had Harris's express oral authority to sign on his behalf and that she handled Harris's business for some time. According to Midtown, because Mavis claimed that Harris gave her express oral authority to sign the agreement,

---

[2] Midtown only argues that Mavis had *actual* authority, rather than apparent or implied authority. Although Midtown made the latter arguments below, it failed to raise them on appeal. But even if it had, these arguments would fail for the same reason explained below: Agency can't be proven by the statements of the agent alone. *See Boren v. Weeks*, 251 S.W.3d 426, 433 (Tenn. 2008) ("Apparent authority is established through the acts of the principal rather than those of the agent or through the perception of a third party."); *Hall v. Haynes*, 319 S.W.3d 564, 573 (Tenn. 2010) ("Implied authority must be predicated on some act or acquiescence of the principal, rather than the actions of the agent." (internal quotations omitted)).

then she had such authority. In other words, Midtown's theory is that an agent should be taken at his word.

But in Tennessee, the words of an alleged agent, standing alone, aren't enough to prove agency. As the Tennessee Supreme Court explained long ago, "[t]o allow [an agent's] declarations to prove his own agency . . . would be an infraction of the well[-]settled rule that an agency can not be proved by the declarations of the supposed agent." *See Moore v. Davis*, 51 Tenn. 540, 543 (1871).

And since then, the Tennessee courts have consistently followed this well-settled rule. For example, a chauffeur's statement that he was "on a mission" for his employer wasn't enough to establish his agency. *See Frank v. Wright*, 205 S.W. 434, 436 (Tenn. 1918). This was because "an agent cannot create authority in himself . . . by asserting his authority to do the particular act, or say that in so doing he was acting within the line of his duty." *Id.* So too where, as here, the agent's representation is part of the contract itself. For example, the Tennessee Court of Appeals held that agency couldn't be proven when the "only proof in the record of agency" was the alleged agent's representations in "the language in the contract." *See John J. Heirigs Constr. Co. v. Exide*, 709 S.W.2d 604, 608 (Tenn. Ct. App. 1986). Why? Because "[a]gency . . . may not be proved solely by the statements of the agent." *Id.* Similarly, a corporation's signature doesn't establish its agency; again, this is because "agency may not be proven by the out-of-court, unsworn statement of the agent." *Haury & Smith Realty Co. v. Piccadilly Partners I*, 802 S.W.2d 612, 615 (Tenn. Ct. App. 1990).

This rule makes sense. After all, if an alleged agent's representation alone could establish agency, then a principal could be bound by all sorts of acts he never authorized. That's why agency must "flow[] from the manifestations of the principal to the agent." *Milliken Grp., Inc. v. Hays*

*Nissan, Inc.*, 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001). And so a principal "must say or do something to make [another] his agent before a court will find that an agency relationship exists." *Harben v. Hutton*, 739 S.W.2d 602, 606 (Tenn. Ct. App. 1987).

In sum, Midtown's evidence falls short. Midtown offers nothing from Harris to prove that he authorized his wife to sign the arbitration agreement, or any of his other forms for that matter. And nothing in the record suggests that Mavis had such authority. Midtown's reliance on Mavis's representation in the contract isn't enough. Thus, we hold that Mavis's signature doesn't bind Harris's estate to the arbitration agreement.

In response, Midtown cites two unpublished decisions from the Tennessee Court of Appeals, *Necessary v. Life Care Centers. of America, Inc.*, No. 2006-00453, 2007 WL 3446636 (Tenn. Ct. App. Nov. 16, 2007), and *Watson v. Quince Nursing & Rehabilitation Center, LLC*, No. 2019-00261, 2019 WL 6877897 (Tenn. Ct. App. Dec. 17, 2019). But those cases don't govern here.

To be fair, those cases are factually similar to this one. In both, a family member signed an arbitration agreement on behalf of another family member while admitting them into a nursing home. *See Necessary*, 2007 WL 3446636, at *1; *Watson*, 2019 WL 6877897, at *1. And in both, the nursing homes argued that the resident's estate should be bound by that signature. *Id.* The Tennessee Court of Appeals ultimately agreed with the nursing homes, *see Necessary*, 2007 WL 3446636, at *5; *Watson*, 2019 WL 6877897, at *5, and Midtown urges us to do the same.

But those cases turned on a different issue. There, the plaintiffs conceded that the family members had express authority to sign the admissions documents on behalf of the resident. *Necessary*, 2007 WL 3446636, at *5; *Watson*, 2019 WL 6877897, at *3. Their only argument was that this authority didn't include signing an arbitration agreement. *See Necessary*, 2007 WL

3446636, at *5; *Watson*, 2019 WL 6877897, at *5. So the question before the court was a narrow one. The court wasn't answering whether the family member had authority to sign the admissions documents—that was undisputed—rather, it was determining the *scope* of that authority. Thus, in *Necessary* the court held that "[p]laintiff, who had the [d]ecedent's express authority to sign the admission documents at the healthcare facility, *also* had the authority to sign the arbitration agreement on behalf of the [d]ecedent's behalf as one of those admission documents." *Necessary*, 2007 WL 3446636, at *5 (emphasis added and footnote omitted). And the court repeated that holding in *Watson*. 2019 WL 6877897, at *5.

Here, by contrast, the estate doesn't make the same concession. In fact, the estate argues that Mavis lacked any authority to sign Harris's admissions documents. So we face the question undisputed in *Necessary* and *Watson*: Was Mavis authorized to sign Harris's admissions documents? And on that question, *Necessary* and *Watson* offer no guidance.

But a different decision from the Tennessee Court of Appeals does. In *Thornton*, a daughter signed an arbitration agreement on her mother's behalf while admitting her into a nursing home. *Thornton v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2007-00960-COA-R3-CV, 2008 WL 2687697, at *1 (Tenn. Ct. App. Aug. 1, 2008). The agreement stated that "the undersigned certifies" that she is "a person duly authorized by the Resident or otherwise to execute this Agreement and accept its terms." *Id.* at *2. And the daughter signed the agreement as "the [d]esignated [r]epresentative." *Id.* But despite this representation, the Tennessee Court of Appeals held that "no actual . . . agency relationship existed between [mother] and [d]aughter." *Id.* at *8. And the court emphasized that the nursing home "simply cites no single action by the [mother] where she indicated . . . that [the] [d]aughter was her agent." *Id.* Thus, the court did what "other

Tennessee cases" had done and found "no authority [where] the principal did not exhibit some sort of act to convey the authority." *Id.* at *7.

Taken together, these cases show that when the plaintiff doesn't concede that the family member had authority to sign admissions forms, then the family member's representations in the contract, standing alone, aren't enough to establish that authority. *See id.* at *7–*8; *see also Manley v. Humboldt Nursing Home, Inc.*, No. W2019-00131-COA-R3-CV, 2020 WL 5587721, at *3–*4 (Tenn. Ct. App. Sept. 18, 2020) (holding that a daughter's signature doesn't bind the mother to an arbitration agreement when there is no evidence that the daughter had authority to sign the agreement).

At bottom, Midtown failed to show that Mavis had authority to sign the arbitration agreement on behalf of her husband. Even though Mavis claimed such authority, that representation isn't enough. As a result, the arbitration agreement doesn't bind Harris's estate, and we can't compel arbitration. *See AT&T Techs.*, 475 U.S. at 648 (quotation omitted).

We **AFFIRM**.